IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION



FILED
APR 1 5 2021
Clerk, U.S. District Court
Eastern District of Texas

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | |
| V. | § § | Case No. 4:20-CR-210 |
| | § | Judge Mazzant |
| TOMMY RAY WILLIAMS (01) and | § | |
| WHITNEY JANE LAW (02) | § | |

## FIRST SUPERSEDING INDICTMENT

THE UNITED STATES GRAND JURY CHARGES:

## COUNT ONE

Violation: 18 U.S.C. §§ 1349 and 1343 (Conspiracy to commit wire fraud)

**A.    Introduction**

At all times material to the facts set forth in this Indictment:

1.    **Tommy Ray Williams ("Williams")** was an individual residing in Dallas, Texas.

2.    **Whitney Jane Law ("Law")** was an individual residing in Dallas, Texas.

3.    WJL Home Remodel was an assumed-name business entity operated by **Williams** and **Law**.

4.    MCO Remodel was an assumed name business entity operated by **Williams** and **Law**.

5.    Turnkey Renovations was an entity that was formed by an individual W.W. and **Williams** in furtherance of the scheme.

1

6. J.P. Construction was a business entity that was formed by an individual J.P. that was later assumed by **Williams** and **Law** in furtherance of the scheme.

7. Bank of America was a financial institution and was insured by the Federal Deposit Insurance Corporation.

8. First National Bank Texas was a financial institution and was insured by the Federal Deposit Insurance Corporation.

9. Home Advisor was a business operating a publicly accessible website that provided referrals to businesses providing services such as home remodeling. Business entities or individuals could contract with Home Advisor to have their business information and profile listed as available to do work. Members of the public could locate the Home Advisor website on the world wide web by means of logging onto a computer with internet access and then view information on the website about the businesses that had contracted with Home Advisor to be listed. Individuals could also load their personal contact information and the type of work that they were seeking to have done into a customer profile by transmitting the data electronically to Home Advisor. Home Advisor would then transmit leads or referrals for potential work to companies or contractors doing business in the customer's area. Home Advisor's computer servers that contained the website interface to which members of the public transmitted information were located in the state of Colorado.

10. Townsquare Interactive, LLC ("Townsquare") was a company that designed and hosted websites for other companies, as well as purchased domain names for companies.

11. Square, Inc. ("Square") was a company that provided payment processing services to businesses that accepted credit card payments.

**B. The Scheme to Defraud**

12. From on or about February 1, 2017, and continuing up to the date of on or about December 1, 2017, in the Eastern District of Texas and elsewhere, the Defendants, **Williams** and **Law**, together with others known and unknown to the grand jury, agreed to commit wire fraud, each defendant knowing the unlawful purpose of the agreement, and each defendant joining the agreement with the intent to further the unlawful agreement. Having entered into this conspiracy and agreement, the defendants knowingly devised and intended to devise a scheme and artifice to defraud, the scheme employing false material representations, pretenses, and promises, and for the purpose of executing the scheme and artifice, and attempting to do so, transmitted and caused to be transmitted by means of wire communication in interstate commerce writings, signs, signals, pictures, and sounds for the purpose of executing the scheme, and the defendants each did so with specific intent to defraud, all in violation of 18 U.S.C. § 1349 and 1343.

**C. Manner and Means**

It was part of the scheme and artifice that:

13. On or about April 4, 2017, **Law** signed and caused to be filed with the Dallas County Clerk a Certificate of Ownership for Unincorporated Business or Profession within the county assumed name records. This certificate stated that "WJL Home Remodel" was a name under which business or professional services would be conducted as a proprietorship, with **Law** named as the business owner.

14. On or about March 23, 2017, Williams had filed a petition in bankruptcy in the Northern District of Texas, which required him to list his assets and creditors for the bankruptcy court.

15. On or about September 1, 2017, **Law** signed and caused to be filed with the Dallas County Clerk an Assumed Name Certificate for an Incorporated Business or Profession within the county assumed name records. This certificate stated that "MCO Home Remodel" was a name under which business or professional services would be conducted as a proprietorship, and in the certificate **Law** was described as the business owner.

16. On or about April 3, 2017, **Law** opened a checking account at First National Bank Texas under the name Whitney Law, account number XXXXX4547.

17. On or about April 7, 2017, **Law** opened a checking account at First National Bank Texas under the name Whitney Law, DBA WJL Home Remodel, account number XXXXXX7900.

18. On or about May 19, 2017, **Law** opened a business checking account at Bank of America under the name Whitney Jane Law Sole Proprietor DBA WJL Home Remodel, account number XXXXX7089.

19. On or about February 21, 2017, **Law** established an online account with Home Advisor for a business known as WJL Home Remodel.

20. On or about August 7, 2017, **Law** and others established an account with Home Advisor for a business known as MCO Home Remodel.

21. On or about May 9, 2017, **Law** hired Townsquare Interactive, LLC ("Townsquare") to create and host a website for the company under the name of "WJL Home Remodel."

22. On or about August 30, 2017, **Law** requested that Townsquare change the name of the business to "MCO Home Remodel" and that the website be re-designed and a new domain be purchased with this name. Townsquare changed the business name, purchased a new domain name, and redesigned the website to reflect MCO Home Remodel as the business name, in accordance with **Law's** requests.

23. The defendants' scheme involved securing referrals for home remodeling work from Home Advisor, providing bids for home remodeling work, beginning the work and requiring substantial amounts of money from the homeowners, and then abandoning the remodel work before it was complete but keeping the money the homeowners had paid. During the course of the scheme individuals within the State of Texas, including individuals with homes in the Eastern District of Texas, would log onto the internet and navigate to Home Advisor's website to search for home remodeling contractors. By entering their name, phone number, and address, and designating the type of remodeling work they required, the homeowners would then receive referral information for contractors located or working within their geographic area that they could contact. Further, Home Advisor would also provide information for these potential customers to the businesses, such as WJL Home Remodeling and MCO Home Remodeling, that had subscribed with Home Advisor to be listed contractors. **Williams** and **Law** would receive the referral information for the homeowner and then contact the homeowner and

arrange for a site inspection. **Williams**, sometimes accompanied by **Law**, would travel to the homeowner's residence, discuss the types of remodeling work required, and provide a bid for services. On occasion **Williams** would have an associate of his do the preliminary site inspection and bid. **Williams** would require a large amount of money before the work began and often would require more funds immediately after the work began, blaming this on costs such as materials that had to be purchased. **Williams** would require that the homeowners write out checks payable to **Law** or to him, or to one of the business entities that they used. **Williams** or **Law** would then cash the checks or would deposit the checks into the Bank of America account number XXXXX7089 or the First National Bank Texas account number XXXXXX7900. **Williams** and **Law** frequently used a check-cashing business to cash the checks that the victims provided to them, thereby bypassing traditional bank accounts. After the homeowner made their initial payments individuals would appear at the house and begin demolition work, often destroying key parts of the home such as plumbing, flooring, sheetrock, walls, and roofing, and would sometimes begin installation or construction work. Soon after the work began, however, the work crews would stop coming to the residence and the renovation work would be left undone. The homeowners would try to contact **Williams**, who would sometimes respond but eventually stopped responding, and did not return their funds.

24. Home Advisor eventually deleted or deactivated the WJL Home Remodel account. After this occurred, other individuals known to **Williams** and **Law** contacted Home Advisor and, using the name of an individual M.O., created a new account in the name of MCO Investment Properties and Home Remodeling, and the scheme continued

using this business as a Home Advisor referral remodeling company. **Law** also contacted Townsquare to change the business name and domain name of the website to MCO Home Remodel. On a separate occasion, an individual J.P., known to **Williams** and **Law**, contacted Home Advisor and created a new account in the name of J.P. Remodel, and the scheme continued using this business as a Home Advisor referral remodeling company.

25. The defendants were personally enriched by the scheme and artifice. From on or about February 1, 2017, to on or about December 1, 2017, **Williams** and **Law** entered into agreements with approximately 18 homeowners to perform home remodeling or repair projects but never completed the work and stole the money that the homeowners had provided to them. **Williams** and **Law** used some of the money that the homeowners had provided to pay for materials and labor, but they used large amounts of the funds for their own personal benefit, including for the purchase of multiple vehicles, for spending at casinos, and for upgrading of a Polaris off road vehicle.

26. During the execution of the scheme above multiple individuals paid **Williams** and **Law** by use of credit cards. **Williams** and **Law** would process these payments using the payment services company Square to facilitate the transaction. Several of the victims learned they had been defrauded by the defendants and contacted their credit card companies to challenge the charges as fraudulent. The credit card companies on multiple occasions reversed the charges, crediting back the victims' accounts but requiring Square to process the reversal out of its funds. Square was unable

to recover this money from **Williams** and **Law** and so lost a total of approximately $95,000 during the defendants' execution of their scheme.

27. All told, **Williams** and **Law** executed their scheme against approximately 18 individuals. The individual victims and Square (through credit card charge backs) lost a total exceeding approximately $850,000 to **Williams** and **Law** during the defendants' execution of their scheme.

**D.     The Execution of the Scheme and Artifice**

In furtherance of the conspiracy and to achieve its objects and purpose, the following acts, among others, were committed in the Eastern District of Texas and elsewhere:

The Execution of the Fraud Scheme against S.K.

28. On or about June 21, 2017, S.K. logged onto the internet while in the Eastern District of Texas at his residence and viewed the Home Advisor website. S.K. then provided his contact information through the Home Advisor online portal, by means of interstate wire transmission from Texas to the Home Advisor computer server located in the State of Colorado.

29. On or about June 21, 2017, Home Advisor then sent information about potential contractors and referrals for those contractors to S.K. by means of interstate wire transmissions from Colorado to Texas. After this, S.K. contacted the contractors, including WJL Home Remodel. S.K. also logged onto the website for WJL Home Remodel that was hosted by Townsquare, which contained positive testimonials and photographs of work supposedly completed by WJL. S.K. spoke with **Law** when he

8

called the WJL Home Remodel phone number, and **Law** arranged for an individual to come to the residence to review the project. The individual told S.K. that the job was complicated and that he would need to call his boss, **Williams**. In or about June or July, 2017, **Williams** and another individual came to S.K.'s residence; **Williams** identified the other individual as his foreman. **Williams** reviewed the project scope and later **Law** sent a proposed contract to S.K. **Williams** and **Law** later came to S.K.'s residence and **Williams** identified **Law** as the owner of WJL.

30. On or about July 31, 2017, S.K. and **Law** signed a contract for work, with **Law** signing as "contractor" for WJL Home Remodel. **Williams** asked for $22,000 to begin the job.

31. On or about August 1, 2017, S.K. gave **Law** a cashier's check payable to "WJL Home Remodel" in the amount of approximately $22,000. Demolition work began soon afterwards, with removal of the family room, ceiling, and garage of the residence.

32. On or about August 3, 2017, **Williams** required another $10,000 by cashier's check, and S.K. gave another check to **Law** in this amount, payable to "WJL Home Remodel." After demolition, work basically stopped, S.K. determined that no permits had been pulled for the work, and **Williams** provided excuses and stated that no permits were needed. S.K. instructed **Williams** to stop working. In total, S.K. paid **Williams** and **Law** $32,000 to complete the work on his residence and lost this money to the defendants during their execution of the scheme.

The Execution of the Fraud Scheme against B.L.

33. On or about August 16, 2017, B.L. logged onto the internet while in the Eastern District of Texas at her residence and viewed the Home Advisor website. She then provided her contact information through the Home Advisor online portal, by means of interstate wire transmission from Texas to the Home Advisor computer server located in the State of Colorado.

34. On or about August 16, 2020, Home Advisor then sent a "lead" by means of interstate wire transmission from Colorado to Texas to WJL Home Remodeling. After this, **Law**, while pretending to be another individual (M.O.), called B.L. by phone. **Law** told B.L. that the company had changed names and was now operating under the name "MCO Remodeling," and that she would send someone to B.L.'s residence to provide an estimate for the work that B.L. wanted to have done. On or after August 16, 2017, an individual came to the B.L. residence on behalf of MCO Remodeling to review the property and gather information for a bid.

35. On or about August 24, 2017, **Law** sent an email to B.L. with a written proposal for work; **Law** signed the email under M.O.'s name.

36. On or about September 1, 2017, **Williams** arrived at B.L.'s house and reviewed the work that B.L. wanted to have done and told B.L. that he owned both MCO Remodeling and WJL Home Remodeling. **Williams** represented that he had been in the business for many years and had good reviews, and eventually provided a written agreement to B.L. describing the work to be done.

10

37. On or about September 25, 2017, **Williams** told B.L. that he wanted payment up front, and B.L. wrote a check payable to "Tommy Ray Williams" in the amount of approximately $27,500, and gave the check to **Williams**. After this payment, over the next several days a crew began demolition work at the residence, including tearing off portions of the roof and other destruction of portions of the residence.

38. On or about September 29, 2017, B.L. wrote another check payable to "Tommy Ray Williams" in the amount of approximately $21,000; this check was cashed on or about that same date. Work slowed over time and B.L. was left without electricity in the front portion of the house, which was to be rewired per the contract. In early October of 2017 crew members eventually stopped appearing and do the work except for sporadic dates.

39. On or about October 27, 2017, **Williams** demanded an additional $3,500 and threatened to put a lien on the house unless B.L. paid him. B.L. wrote another check payable to "Tommy Williams" in the amount of approximately $3,500, even though the work had essentially ceased and crew members told B.L. they were not being paid; this check was endorsed and cashed on or about that same date. Eventually B.L. ended her agreement with **Williams** in light of **Williams'** failure to do the work. In total B.L. paid **Williams** and MCO Remodeling approximately $52,000 plus costs of materials do the work, which **Williams** did not do, and B.L. lost these funds to the defendants during the execution of the scheme. B.L. had to hire another contractor to do the work properly, paying that contractor a total of approximately $60,000.

The Execution of the Fraud Scheme against P.C.

40. In or about August of 2017, P.C. was looking for a contractor to perform remodeling work on a residence she owned in the City of Trinidad, Texas, in the Eastern District of Texas. She received information about **Williams** as a possible contractor from an individual and placed a call to **Williams** in or about August of 2017 to arrange for a bid proposal. In or about August of 2017, P.C. logged onto the internet while in the State of Texas at and viewed the Home Advisor website, where she was able to see the contractor information advertising services offered by MCO Investment Properties, along with purported favorable reviews. Additionally, one of P.C.'s relatives logged onto the internet and viewed MCO Investment Properties' website hosted by Townsquare, which included photos of remodeled homes purportedly showing work done by MCO Investment Properties. Based on these representations, P.C. moved forward working with **Williams** and **Law**.

41. On or about August 26, 2017, **Williams** and another associate met P.C. at the house located in Trinidad, Texas, in the Eastern District of Texas, to discuss the project. P.C. and **Williams** reached an agreement about the scope of work to be done and demolition work began.

42. On or about August 26, 2017, and August 28, 2017, P.C. paid a total of approximately $25,000 (in multiple payments) to WJL Home Remodeling by means of a credit card using Square, a payment transaction service.

43. On or about August 30, 2017, P.C. wrote a check payable to "Whitney Law" in the amount of approximately $15,000 for the work. Following receipt of the

check, Law emailed a receipt under the name "WJL Home Remodel" to P.C. Demolition work on the house began, as well as cutting down of trees per the parties' agreement.

44. On or about August 30, 2017, **Williams** discussed materials to be delivered and picked up from the site, and told PC about the work that the crew had supposedly done, as P.C. lived in a different location in another county and could not see the work being done. Over the course of several days P.C. kept contacting **Williams** by phone and **Williams** would represent that the crew would be out to finish the work, but they did not return after conducting major demolition on the house. In the end, the house was gutted and left without most of its walls, exposed to the weather. Multiple trees were cut down but left laying on the ground at the property. P.C. asked **Williams** to at least deliver the materials that he had purportedly purchased for the job, but **Williams** refused to do so. P.C. requested that her credit card company credit back the $25,000 she paid by credit card and her credit card company did so, resulting in a loss to Square in this amount because Square could not recover the funds from **Williams** and **Law**. All told, P.C. paid **Williams** and **Law** approximately $40,000 for the work that **Williams** did not do, recovered approximately $25,000 from her credit card company, and lost the remainder of $15,000 to the defendants during the defendants' execution of their scheme.

The Execution of the Fraud Scheme against J.C.

45. On or about September 30, 2017, J.C. logged onto the internet while in the Eastern District of Texas at his residence and viewed the Home Advisor website. He then provided his contact information through the Home Advisor online portal, by means

of interstate wire transmission from Texas to the Home Advisor computer server located in the State of Colorado.

46. On or about September 30, 2017, Home Advisor transmitted information about J.P. Construction and **Williams** to J.C. by interstate wire transmission from Colorado to Texas. Home Advisor also sent a "lead" related to J.C.'s project to J.P. Construction on or about September 30, 2017, by means of interstate wire transmission from Colorado to Texas. After this, **Williams** came to J.C.'s residence to review the work J.C. wanted done and quoted J.C. the price of $4,200, with an up-front payment of $2,600.

47. On or about October 4, 2017, **Williams** and J.C. signed a contract for the work, with **Williams** signing on behalf of JP Construction.

48. On or about October 5, 2017, J.C. wrote a check payable to "Tommy Williams" in the amount of approximately $2,600 and provided it to one of **Williams's** associates. The check was negotiated to another individual and cashed. **Williams** never showed up to do the work, but workers did demolition work at J.C.'s house. J.C. repeatedly contacted **Williams** to schedule the completion of the job, but **Williams** never completed the work. On one occasion when J.C. spoke to **Williams** about the job, **Williams** threatened J.C. with physical harm. All told, J.C paid $2,600 to **Williams** and lost this money to the defendants during their execution of the scheme.

All in violation of 18 U.S.C. §§ 1349 and 1343.

# NOTICE OF INTENT TO SEEK CRIMINAL FORFEITURE

## Pursuant to 18 U.S.C. §§ 981(a)(1)(c) and 28 U.S.C. § 2461

As the result of committing the foregoing offense alleged in this Indictment, the defendants herein shall forfeit to the United States pursuant to 18 U.S.C. § 981(a)(1)(c) and 28 U.S.C. § 2461:

1. any property constituting, or derived from, and proceeds the defendants obtained, directly or indirectly, as the result of such violations; and

2. any of the defendants' property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violations, including, but not limited to the following:

## Cash Proceeds

United States currency and all interest and proceeds traceable thereto, to the extent that it is property constituting, or derived from, proceeds obtained directly or indirectly, as the result of the foregoing offenses alleged in this Indictment.

## Substitute Assets

If any of the property described above as being subject to forfeiture, as a result of any act or omission of one or both of the defendants -

    (a) cannot be located upon the exercise of due diligence;

    (b) has been transferred or sold to, or deposited with a third person;

    (c) has been placed beyond the jurisdiction of the court;

    (d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property, including but not limited to all property, both real and personal owned by the defendants.

By virtue of the commission of the offense alleged in this Indictment, any and all interest the defendants have, jointly or separately, in the above-described property is vested in the United States and hereby forfeited to the United States pursuant to pursuant to 18 U.S.C. § 981(a)(1)(c) and 28 U.S.C. § 2461.

A TRUE BILL

_____   4/14/21
GRAND JURY FOREPERSON             Date

NICHOLAS J. GANJEI
ACTING UNITED STATES ATTORNEY

_____   April 14, 2021
BY: THOMAS E. GIBSON              Date
Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | |
| V. | § § | Case No. 4:2-CR-210 |
| | § | Judge Mazzant |
| TOMMY WILLIAMS (01) and | § | |
| WHITNEY JANE LAW (02) | § | |

## **NOTICE OF PENALTY**

### **COUNT ONE**

Violation:            18 U.S.C. §§ 1349, 1343 (Conspiracy to commit wire fraud)

Penalty:            Imprisonment for a term not more than 20 years, a fine not to exceed $250,000.00, or not more than the greater of twice the gross gain to the defendant or twice the gross loss to one other than the defendant, or both. A term of supervised release of not more than three years in addition to such term of imprisonment.

Special Assessment:        $100.00